567 F.2d 150
 185 U.S.App.D.C. 283
 BARRETT MOBILE HOME TRANSPORT, INC., Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Jesse Sherman, d/b/a Sherman Trailer Transportation, Intervenor.
 No. 76-1255.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 1, 1977.
Decided Dec. 6, 1977.
 
 John R. Bagileo, Washington, D. C., with whom Donald E. Cross and Leo C. Franey, Washington, D. C., were on brief, for petitioner.
 Carl E. Howe, Jr., Atty., I. C. C., Washington, D. C., with whom Arthur J. Cerra, Gen. Counsel, I. C. C., Charles H. White, Jr., Associate Gen. Counsel, I. C. C., and Carl D. Lawson, Atty., Department of Justice, Washington, D. C., were on the brief, for respondents. Samuel R. Simon, Atty., Dept. of Justice, Washington, D. C., for respondent United States of America.
 Before TAMM, ROBINSON and ROBB, Circuit Judges.
 Opinion Per Curiam.
 
 PER CURIAM:
 
 1
 Jesse Sherman, doing business from Cheyenne, Wyoming, as Sherman Trailer Transportation, Inc., sought temporary authority pursuant to Section 210a of the Interstate Commerce Act[1] to engage in the transportation of mobile homes in eight western states.[2] Competing carriers protested, and the Motor Carrier Board of the Interstate Commerce Commission denied the request.[3] On appeal, however, Division 1 of the Commission vacated the Board's order and granted temporary authority restricted to secondary movement[4] of mobile homes within the eight states.[5] Barrett Mobile Home Transport, Inc., a competitor, invokes our review of that order, arguing that the Commission awarded the authority despite the absence of adequate supporting data, and thus acted arbitrarily and capriciously.
 
 
 2
 A motor carrier soliciting temporary operating authority must show that shippers have an immediate and urgent need for the service contemplated and that existing carriers cannot meet that need.[6] And the Commission's regulations provide that "(r)equests for temporary authority involving service to or from entire States" must be buttressed by need-data relating to "a representative number of points in each such State. . . . "[7] Although Sherman's temporary authority is now confined to operations within the eight states that either begin or terminate in Wyoming,[8] we are still unable to discern how the Commission derived from the materials before it sufficient knowledge to enable an informed exercise of discretion on Sherman's application.[9]
 
 
 3
 Few if any of Sherman's supporting statements contain information of the kind required by the Commission's rules.[10] Although these rules are not of a nature binding on the Commission,[11] they do denote the contours of what the Commission at least at one time thought it should know. The Commission has not explained why the data called for by the regulations are not necessary in this case; nor does common sense suggest a reason. We do not demand strict compliance with the regulations, but we must insist upon an administrative record that is not "devoid of information" underpinning the application.[12]
 
 
 4
 The sparseness of Sherman's supporting documents, in contrast with the vast area over which temporary operating authority was granted, precludes a holding that the Commission has as yet properly exercised its discretion. There were no statements specifically describing the need for service to or from South Dakota, Idaho and Utah, three of the states for which the application was granted. For Nebraska there was but one statement, and it asserted merely that existing service was inadequate because the carriers furnishing it required up to a month's notice prior to shipment. Two statements were filed for Colorado one from a homeowner who based need on frequent moving, and the other from a businessman who had never sought service from existing carriers, and whose only need was for excess moves that his own trucks could not accommodate. The two statements pertaining to North Dakota came from individuals who envisioned a future but uncertain need from possible job transfers, which were not necessarily to Wyoming. They were unhappy with some other carriers, but made no claim that existing service would be inadequate for their purposes.
 
 
 5
 Similarly, the seven statements relating to Montana all came from mobile home dealers who, for the most part, alleged that their customers are not always able to get service precisely when it is desired. Most of the dealers said that they used their own trucks for most of their transportation activities, and none mentioned any existing carriers from which customers had been unable to obtain prompt service. The few specifics given did not involve any proposed movements to Wyoming. The ten statements dealing with Wyoming all came from parties located in Cheyenne none of whom specified points in other states to which traffic would be moving, and none indicated pending movements that all existing carriers had refused or were made to handle within a reasonable time.
 
 
 6
 Thus, most of the statements contained only generalized expressions of discontent with the quality and timeliness of other carriers' performances. This information might support a grant of permanent authority in the areas where such deficiencies were documented, but it hardly indicates an urgent need for extra service even for the areas actually discussed in the statements.
 
 
 7
 While we realize that the Commission must be given great leeway in dealing with applications for temporary authority, we must admonish once again that decisions unsupported by relevant data are simply arbitrary.[13] The Commission may be able to explain how the meager evidence furnished it can establish an urgent need for additional service over the eight-state area that cannot be satisfied by certificated carriers already operating within the area; but it has not done so, and no rationale for its action is obvious.[14] We must, then, remand this case to the Commission for reconsideration of the grant of temporary authority in light of the discussion in this opinion.[15]
 
 
 8
 So ordered.
 
 
 
 [1]
 49 U.S.C. § 310a (1970)
 
 
 [2]
 The states are Colorado, Idaho, Montana, Nebraska, North Dakota, South Dakota, Utah and Wyoming
 
 
 [3]
 Jesse Sherman, Doc. No. MC-140337 (Sub-No. 2TA) (Motor Carrier Bd. June 24, 1975) (unreported), Petitioner's Appendix at 55a
 
 
 [4]
 Secondary movement is movement from points other than the point of manufacture or assembly
 
 
 [5]
 Jesse Sherman, Doc. No. MC-140337 (Sub-No. 2TA) (Div. 1, acting as appellate division, Oct. 14, 1975) (unreported), Petitioner's Appendix at 59a. Sherman has also applied for a more limited type of permanent operating authority within the eight-state area. See note 8 infra. Although § 210a sets the maximum duration of temporary authority at 180 days, if an application for permanent authority is made, the temporary authority, by virtue of § 9(b) of the Administrative Procedure Act, 5 U.S.C. § 558(c) (1970), "does not expire until the (permanent) application has been finally determined by the agency." Pan-Atlantic S.S. Corp. v. Atlantic Coast Line R.R. Co., 353 U.S. 436, 439-440, 77 S.Ct. 999, 1002-1003, 1 L.Ed.2d 963, 966-967 (1957). The Commission has not yet reached a final decision on Sherman's application for permanent authority
 
 
 [6]
 Interstate Commerce Act, § 210a, 49 U.S.C. § 310a (1970)
 
 
 [7]
 49 C.F.R. § 1131.4(b)(1)(i) (1976)
 
 
 [8]
 At oral argument we first learned that Sherman's application for permanent authority had been narrowed to ask only for permission to transport between points in Wyoming and points in the other seven states, and that the Commission had modified Sherman's temporary authority to make it congruent with the new request. On April 13, 1977, we called for supplemental memoranda addressing any changes that this narrowing might have caused in the factual or legal issues before us
 
 
 [9]
 See Doe v. Hampton, 183 U.S.App.D.C. ---, --- - ---, n.22, 566 F.2d 265, 288 n.22 (1977) (dissenting opinion)
 
 
 [10]
 See 49 C.F.R. § 1131.2(c) (1976). The statements often omit such items as the volume of traffic, the frequency of movement, the point in time when service was needed, the duration of the need, the consequences of nonfulfillment of the need, the prior efforts to obtain service and the names of carriers who failed to provide service in the past
 
 
 [11]
 American Farm Lines v. Black Ball Freight Serv., 397 U.S. 532, 538-539, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547, 552-553 (1970)
 
 
 [12]
 Id. at 538, 90 S.Ct. at 1292, 25 L.Ed.2d at 552-553
 
 
 [13]
 See Michigan Consol. Gas Co. v. FPC, 108 U.S.App.D.C. 409, 423 n.41, 283 F.2d 204, 218 n.41, cert. denied, 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227 (1960) ("(i)t is elementary that the ruling of an administrative agency cannot stand if the conclusion or an ultimate fact does not flow rationally from subsidiary facts")
 
 
 [14]
 Applications for temporary authority, unlike those for permanent authority, do not seem supportable on a theory that competition for its own sake is a public benefit. Compare P. C. White Truck Line, Inc. v. ICC, 179 U.S.App.D.C. 367, 551 F.2d 1326 (1977)
 
 
 [15]
 Because the Commission may yet come forward with a reasoned basis for its action, and because we are not in a position to gauge the impact of a sudden termination of Sherman's operating authority, we do not vacate the order granting it. It will be for the Commission to determine whether the order should remain in effect pending reconsideration on remand