## AMERICAN FARM LINES *v.* BLACK BALL FREIGHT SERVICE ET AL.

No. 369.   Argued February 25, 1970—Decided April 20, 1970*

---

*Together with No. 382, *Interstate Commerce Commission* v. *Black Ball Freight Service et al.*, on appeal from the same court.

*Joseph A. Califano, Jr.,* argued the cause for appellant in No. 369. With him on the briefs were *John D. Hawke, Jr.,* and *William L. Peterson, Jr. Arthur J. Cerra* argued the cause for appellant in No. 382. With him on the brief were *Solicitor General Griswold, Assistant Attorney General McLaren, Deputy Solicitor General Springer, John H. D. Wigger,* and *Robert W. Ginnane.*

*William H. Dempsey, Jr.,* argued the cause for appellees in both cases and filed a brief for appellees Consolidated Freightways Corp. et al. In both cases *Ed White* filed a brief for railroad appellees; *William B. Adams, Peter T. Beardsley,* and *Nelson J. Cooney* filed a brief for certain motor carrier appellees, and *James W. Wrape* and *Robert E. Joyner* filed a brief for Dealers Transit, Inc., et al.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The Interstate Commerce Commission has statutory power to grant motor carriers temporary operating authority "without hearings or other proceedings" when the authority relates to a "service for which there is an immediate and urgent need" and where there is "no

carrier service capable of meeting such need." [1]   Interstate Commerce Act § 210a, 52 Stat. 1238, as amended, 49 U. S. C. § 310a.   The ICC processes applications for such authority under rules promulgated in 1965.   49 CFR pt. 1131.[2]   Among other things, those rules require that an applicant accompany his application with supporting statements of shippers that contain information "designed to establish an immediate and urgent need for service which cannot be met by existing carriers."   *Id.,* § 1131.2 (c).   Each such supporting statement "must contain at least" 11 items of information [3] including the following:

> "(8) Whether efforts have been made to obtain the service from existing motor, rail, or water carriers, and the dates and results of such efforts.
>
> "(9) Names and addresses of existing carriers who have either failed or refused to provide the service, and the reasons given for any such failure or refusal."

---

[1] Section 210a(a) provides in part:

"To enable the provision of service for which there is an immediate and urgent need to a point or points or within a territory having no carrier service capable of meeting such need, the Commission may, in its discretion and without hearings or other proceedings, grant temporary authority for such service by a common carrier or a contract carrier by motor vehicle, as the case may be. . . ."

[2] 49 CFR § 1131.4 (b)(2) defines the statutory term "immediate and urgent need" as follows:

"An immediate and urgent need justifying a grant of temporary authority will be determined to exist only where it is established that there is or soon will be an immediate transportation need which reasonably cannot be met by existing carrier service. Such a showing may involve a new or relocated plant, different method of distribution, new or unusual commodities, an origin or destination not presently served by carriers, a discontinuance of existing service, failure of existing carriers to provide service, or comparable situations which require new motor carrier service before an application for permanent authority can be filed and processed."

[3] See 49 CFR § 1131.2 (c).

Appellant American Farm Lines (AFL) filed an application for temporary operating authority.[4] The application was accompanied by a supporting statement of the Department of Defense (DOD). The ICC Tem-

[4] AFL is a federation of agricultural marketing cooperatives created in 1964 to provide transportation for its members. By virtue of § 203 (b) (5) of the Interstate Commerce Act, 54 Stat. 921, as amended, 49 U. S. C. § 303 (b) (5), AFL may transport freight for its members without obtaining a certificate of convenience and necessity from the ICC. In 1965 § 203 (b) (5) was construed to exempt from the certification requirement any freight transportation by an agricultural cooperative for shippers other than its own members to the extent that such nonmember transportation is incidental and necessary to its principal transportation activities. See *Northwest Agricultural Cooperative Assn.* v. *ICC*, 350 F. 2d 252. The next year, AFL began transporting freight for DOD. In 1968–1969 AFL's ability to continue serving DOD was restricted by two events. First, certain competing carriers obtained injunctions prohibiting AFL from making two consecutive movements for DOD and from transporting freight for any nonmember except when going to pick up, or returning from delivery of, a member's freight. *Munitions Carriers Conference, Inc.* v. *American Farm Lines*, 415 F. 2d 747. Second, § 203 (b) (5) was amended to restrict the exemption for agricultural cooperatives to those whose transportation for nonmembers does not exceed 15% of their total annual interstate transportation, measured by tonnage. See 82 Stat. 448, 49 U. S. C. § 303 (b) (5) (1964 ed., Supp. IV). AFL had transported 74,155,685 pounds for DOD between December 1966 and June 1968, and, in an effort to continue providing this service, applied to the ICC in May 1968 for temporary operating authority. The authority sought was to transport general commodities, including Class A and B explosives moving on government bills of lading over irregular routes between points in Kentucky, Indiana, Illinois, Missouri, Arkansas, Louisiana, Texas, Oklahoma, and Kansas on the one hand, and points in Washington, California, Nevada, Utah, and Arizona on the other.

AFL has applied to the ICC for a certificate of permanent authority. It was estimated at oral argument that final action on this application will not be taken by ICC before mid-1971. Meanwhile the ICC may extend the temporary authority. *Pan-Atlantic Steamship Corp.* v. *Atlantic Coast Line R. Co.*, 353 U. S. 436.

porary Authorities Board denied the application on the ground that the "applicant has not established that there exists an immediate and urgent need for any of the service proposed." Division I of the ICC (acting as an Appellate Division) reversed the Board and granted AFL temporary authority. Protesting carriers sought review of this action in the United States District Court for the Western District of Washington. A single judge of the District Court temporarily restrained the operation of the ICC order and the ICC thereupon ordered postponement of the operation of its grant. At that time numerous petitions for reconsideration were pending before the Commission and the stay order did not direct the Commission to stay its hand with respect to them. The record was indeed not filed with the court until much later. Meanwhile, the Commission granted the petitions and reopened the proceeding to receive a further supporting statement of DOD. This took the form of the verified statement of Vincent F. Caputo, DOD Director for Transportation and Warehousing Policy, which was submitted as a purported reply to the pending petitions for reconsideration. Based upon this statement, the ICC entered a new order granting the AFL application. A single judge of the District Court restrained the operation of the new order. Thereafter a three-judge District Court conducted a full hearing on the merits.[5] The ICC admitted at that stage that its first order "may not have been based upon evidence to support its conclusion," but argued that there was no infirmity in the new order. The three-judge court set aside both orders. 298 F. Supp. 1006. Both AFL and ICC appealed to this Court and we noted probable jurisdiction.[6] 396 U. S. 884.

---

[5] The precise chronology of these events is shown in n. 9, *infra*.

[6] ICC is not appealing from the District Court's decision setting aside the first order.

## I

The first alleged error in the case is the failure of the Interstate Commerce Commission to require strict compliance with its own rules. The rules in question, unlike some of our own, do not involve "jurisdictional" problems but only require certain information to be set forth in statements filed in support of applications of motor carriers for temporary operating authority.

The Caputo statement asserted that part of the tremendous volume of traffic that DOD moved in the territories involved had to be moved "in the most expeditious manner possible," and that, since air transport was prohibitively expensive "except in the most extreme emergencies," there was an "imperative" need for the most expeditious motor carrier service. The need for this expeditious transport did not rest merely on a desire to obtain the most efficient service, but in addition rested on the need to coordinate arrival times of shipments with factory production schedules and with ship-loading or airlift times for overseas shipments. The particular inadequacies in existing service were pointed out, namely, the delays inherent in joint-line service, regular-route service, and the use of single drivers. The statement did not assert that *none* of the existing carriers provided sufficiently expeditious service to meet DOD needs; rather it claimed that the carriers providing satisfactory service in the territories in question were so few in number that the additional services of AFL were required to meet DOD's transportation needs.

Concededly, the Caputo statement did not give the dates of DOD's efforts to secure service from other existing carriers.or a complete list of the names and addresses of the carriers who failed or refused to provide service, as required by the terms of subsections (8) and (9), 49 CFR § 1131.2 (c). Such a complete listing of this in-

formation, given the volume of traffic involved, would indeed have been a monumental undertaking.

The failure of the Caputo statement to provide these particular specifics did not prejudice the carriers in making precise and informed objections to AFL's application. The briefest perusal of the objecting carriers' replies, which cover some 156 pages in the printed record of these appeals, belies any such contention. Neither was the statement so devoid of information that it, along with the replies of the protesting carriers, could not support a finding that AFL's service was required to meet DOD's immediate and urgent transportation needs. In our view, the District Court exacted a standard of compliance with procedural rules that was wholly unnecessary to provide an adequate record to review the Commission's decision.

The Commission is entitled to a measure of discretion in administering its own procedural rules in such a manner as it deems necessary to resolve quickly and correctly urgent transportation problems. It is argued that the rules were adopted to confer important procedural benefits upon individuals; in opposition it is said the rules were intended primarily to facilitate the development of relevant information for the Commission's use in deciding applications for temporary authority.

We agree with the Commission that the rules were promulgated for the purpose of providing the "necessary information" for the Commission "to reach an informed and equitable decision" on temporary authority applications. ICC Policy Release of January 23, 1968. The Commission stated that requests for temporary authority would be turned down "if the applications do not *adequately* comply with [the] . . . rules." *Ibid.* (Emphasis added.) The rules were not intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion

as in *Vitarelli* v. *Seaton,* 359 U. S. 535; nor is this a case in which an agency required by rule to exercise independent discretion has failed to do so. *Accardi* v. *Shaughnessy,* 347 U. S. 260; *Yellin* v. *United States,* 374 U. S. 109. Thus there is no reason to exempt this case from the general principle that "[i]t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. The action of either in such a case is not reviewable except upon a showing of substantial prejudice to the complaining party." *NLRB* v. *Monsanto Chemical Co.,* 205 F. 2d 763, 764. And see *NLRB* v. *Grace Co.,* 184 F. 2d 126, 129; *Sun Oil Co.* v. *FPC,* 256 F. 2d 233; *McKenna* v. *Seaton,* 104 U. S. App. D. C. 50, 259 F. 2d 780.

We deal here with the grant of temporary authority similar to that granted in *Estes Express Lines* v. *United States,* 292 F. Supp. 842, aff'd, 394 U. S. 718. There the grant of temporary authority was upheld even though there may not have been literal compliance with subsections (8) and (9) of the Commission's rules. That result was in line with § 210a (a) of the Act which was designed to provide the Commission with a swift and procedurally simple ability to respond to urgent transportation needs. That functional approach is served by treating (8) and (9) not as inflexible procedural conditions but as tools to aid the Commission in exercising its discretion to meet "an immediate and urgent need" for services where the existing service is incapable of meeting that need. Unlike some rules, the present ones are mere aids to the exercise of the agency's independent discretion.

## II

After the Commission issued its first order, petitions for reconsideration were filed and before they were passed

upon, some carriers filed suit and a single judge temporarily restrained operation of that first order. It was after that order issued and over a month before the case was argued to the three-judge court that the Commission granted the petitions for rehearing and reopened the record and received the Caputo verified statement.

The District Court held that the pendency of the review proceedings deprived the Commission of jurisdiction to reopen the administrative record.

Congress has provided as respects some regulatory systems that the agency may modify any finding up until the record is filed with a court. Such is the provision of the National Labor Relations Act, as amended, 61 Stat. 147, 29 U. S. C. § 160 (d) and § 160 (e), which provides that any subsequent changes in the record will be made only at the direction of the court. A similar provision is included in § 5 of the Federal Trade Commission Act, 38 Stat. 719, as amended, 15 U. S. C. § 45 (c) and in § 11. of the Clayton Act, 38 Stat. 734, as amended, 15 U. S. C. § 21 (c). And a like provision is included in the review by the courts of appeals of orders of other designated federal agencies. 28 U. S. C. § 2347 (c) (1964 ed., Supp. IV). But there is no such requirement in the Interstate Commerce Act.[7] It indeed empowers the Commission "at any time to grant rehearings as to any decision, order, or requirement and to reverse, change, or modify the same."[8]

The power of the Commission to grant rehearings is not limited or qualified by the terms of 49 U. S. C.

[7] It was once proposed that the same requirement be written into the law respecting those orders of the Commission reviewed by the courts of appeal as distinguished from the three-judge district courts. See H. R. Rep. No. 1619, 80th Cong., 2d Sess., 4. But the ICC was deleted from the measure. *Id.*, at 1. And the Act as approved covered only other designated agencies. 28 U. S. C. § 2342 (1964 ed., Supp. IV).

[8] See *Baldwin* v. *Scott County Milling Co.*, 307 U. S. 478, 484.

§ 17 (6) or § 17 (7). Thus in § 17 (6) it is said, "Rehearing, reargument, or reconsideration may be granted if sufficient reason therefor be made to appear." And § 17 (7) provides that if after rehearing or reconsideration the original decision, order, or requirement appears "unjust or unwarranted," the Commission may "reverse, change, or modify" the same. These broad powers are plainly adequate to add to the findings or firm them up as the Commission deems desirable, absent any collision or interference with the District Court.

Unless Congress provides otherwise, "[w]here a motion for rehearing is in fact filed there is no final action until the rehearing is denied." *Outland* v. *CAB,* 109 U. S. App. D. C. 90, 93, 284 F. 2d 224, 227. In multi-party proceedings, such as the present one, some may seek judicial review and others may seek administrative reconsideration. "That both tribunals have jurisdiction does not mean, of course, that they will act at cross purposes." *Wrather-Alvarez Broadcasting, Inc.* v. *FCC,* 101 U. S. App. D. C. 324, 327, 248 F. 2d 646, 649. The concept "of an indivisible jurisdiction which must be all in one tribunal or all in the other may fit" some statutory schemes, *ibid.*, but it does not fit this one.

This power of the Commission to reconsider a prior decision does not necessarily collide with the judicial power of review. For while the court properly could provide temporary relief against a Commission order, its issuance does not mean that the Commission loses all jurisdiction to complete the administrative process. It does mean that thereafter the Commission is "without power to act inconsistently with the court's jurisdiction." *Inland Steel Co.* v. *United States,* 306 U. S. 153, 160. When the Commission made the additional findings after its first order was stayed by the court, it did not act inconsistently with what the court had done. It did not interfere in the slightest with the court's protective

order. What the Commission did came before the court was ready to hear arguments on the merits and before the record was filed with it. Moreover, the Commission in light of the District Court's stay, by express terms, directed AFL not to perform operations under the first order and made the second order effective only on further order of the Commission.[9] Since by the Act the Commission never lost jurisdiction to pass on petitions for rehearing, and since the stay order did not forbid it from acting on those pending petitions, it was not necessary for the Commission to seek permission of the court to make those rulings.

The Commission reopened the record merely to remedy a deficiency in it before any judicial review of the merits had commenced and fully honored the stay order of the District Court. It therefore acted in full harmony with the court's jurisdiction.

*Reversed.*

MR. JUSTICE BRENNAN, whom MR. JUSTICE STEWART and MR. JUSTICE WHITE join, dissenting.

I would affirm the judgment of the District Court on the ground that "[e]ven if ICC had jurisdiction to reopen the ICC proceeding and to consider the

---

[9] The District Court's stay was issued October 2, 1968. On October 9, the Commission stayed the effective date of its first order "until further order of the Commission." On November 5, 1968, the Commission reopened the proceeding before it and directed AFL, in light of the District Court's order, "not to perform" any operations under its first order "until further order of the Commission." On November 12, 1968, the Commission advised the District Court of its action. On December 20, 1968, the Commission entered its second order which authorized commencement of service by AFL only on further notice by the ICC. On December 31, 1968, a supplemental complaint was filed in the District Court challenging the Commission's second order. On January 6, 1969, a single judge of the District Court stayed that order. On March 26, 1969, the District Court entered its judgment now being reviewed.

Caputo verified statement, [the statement] would not meet the requirements of categories (8) and (9) of ICC Rule 49 C. F. R. 1131.2 (c)." 298 F. Supp. 1006, 1011.

Insofar as ICC regulations emphasize the requirement of information concerning the ability of existing carriers to provide the service sought by a shipper, they implement not only the statutory standard under Interstate Commerce Act § 210a, 49 U. S. C. § 310a, but also the fundamental scheme of our national transportation policy. Ever since the enactment in 1887 of the Interstate Commerce Act, 24 Stat. 379, national policy has reflected the congressional determination that the public interest is served by regulating competition among carriers. See, e. g., Act of September 18, 1940, § 1, 54 Stat. 899, 49 U. S. C. preceding § 1. Regulation of entry into the motor transportation industry is one important feature of the pattern of regulation. *American Trucking Associations, Inc.* v. *United States,* 344 U. S. 298 (1953); *Pan-Atlantic Steamship Corp.* v. *Atlantic Coast Line R. Co.,* 353 U. S. 436, 440 (1957) (Burton, J., dissenting). The Motor Carrier Part of the Interstate Commerce Act was passed because "the industry was unstable economically, dominated by ease of competitive entry and a fluid rate picture" and "as a result . . . became overcrowded with small economic units which proved unable to satisfy even the most minimal standards of safety or financial responsibility." Therefore, "Congress felt compelled to require authorization for all interstate operations to preserve the motor transportation system from over-competition." *American Trucking Associations, Inc.* v. *United States, supra,* at 312–313. To ensure fair and effective regulation of entry, 49 U. S. C. §§ 305–309 require that entry ordinarily be authorized by the ICC only after full adversary proceedings.

Section 210a is a narrow exception to the basic procedural pattern of the Motor Carrier Part since it

permits the Commission to grant temporary operating
authority after conducting only a minimal adversary
proceeding;[1] under 49 CFR §§ 1131.2–1131.3 action is
taken on the basis of the written application, supporting
statements of shippers, and written responses and
objections of protestants. But § 210a, like the statu-
tory provision considered in *United States* v. *Drum,* 368
U. S. 370, 375 (1962), expressly "bespeaks congressional
concern over diversions of traffic which may harm exist-
ing carriers upon whom the bulk of shippers must depend
for access to market." The section is explicit that the
ICC may grant temporary operating authority only "to
a point or points or within a territory *having no carrier
service capable of meeting such need."* (Emphasis
supplied.)

This congressional concern to protect existing carriers
was again forcefully expressed in the 1968 amendment
to § 203 (b)(5) of the Act, 82 Stat. 448, 49 U. S. C.
§ 303 (b)(5) (1964 ed., Supp. IV), which curtails sub-
stantially the authority of agricultural cooperatives like
AFL to haul nonmembers' freight.

The Senate Committee noted that the decision of the
Court of Appeals for the Ninth Circuit in *Northwest
Agricultural Cooperative Assn.* v. *ICC,* 350 F. 2d 252
(1965), "and the publicity attendant thereto has, as a
practical matter, been construed by some cooperatives
as an invitation to substantially expand their hauling of
non-farm-related traffic for nonfarm members, and by
certain groups and organizations as a device to institute
unlawful transportation activities." S. Rep. No. 1152,
90th Cong., 2d Sess., 6. The report also states, at 2:

"The relative decline of the Nation's common
carrier system in recent years is a matter of serious

---

[1] In some "emergency" situations temporary authority may be
granted without the notice to protestants otherwise required by ICC
rules. See 49 CFR § 1131.2 (d). That provision is not at issue in
this case.

concern. Several traffic studies reveal that common carriers have lost considerable traffic which they formerly handled and, at the same time, have been unable to share proportionately in the additional traffic generated by the Nation's expanding economy.

"This decline is essentially a result of the growth of unregulated private and exempt carriage. But it is also attributable in part to the growth of unauthorized and illegal carriage. Such illegal operators are inimical to the public interest, and if left unchecked, could ultimately undermine the common carrier system."

The ICC recognizes its duty to give effect to this congressional concern for existing carriers in the provision of Rule 1131.4 (b)(2) that "[a]n immediate and urgent need justifying a grant of temporary authority will be determined to exist only where it is established that there is or soon will be an immediate transportation need which reasonably cannot be met by existing carrier service." This key determination is made upon the basis of the information supplied in response to items (8) and (9) of 49 CFR § 1131.2 (c). Reasonable disclosure of whatever evidence there may be as to the inadequacy of existing service is thus of crucial importance. Disclosure makes it possible for protestants to frame specific objections addressed to concrete situations, and thereby comply with the provision of Rule 1131.3 (a)(2) that protests "must be specific as to the service which [the] protestant can and will offer . . . ." Disclosure also permits the ICC to come to an informed judgment that properly respects the congressional concern for existing carriers. It follows that details and not generalities are called for. There must be disclosure, by dates and results, of efforts made by the shipper to obtain the needed service from existing carriers, with names and specific reasons given for failure or refusal

to provide the service. In a case such as this, ICC action without such information flouts the congressional concern.

ICC Rules 1131.2 (c)(8) and (9) are not hypertechnical rules, or mere matters of housekeeping convenience. They go to the heart of the issue in a temporary authority proceeding. The significance of the rules does not depend on whether, in the Court's words, they "confer important procedural benefits upon individuals," but rather on the fact that they are designed to elicit information crucial to determining whether in light of congressional policies a particular factual situation warrants the grant of a temporary authority. Nor is the question in this case, as the Court assumes, whether the ICC erred in failing to require "strict" compliance with the rules. The District Court did not hold the Commission to a standard of strict compliance, and appellees have not argued that strict compliance is required. The issue is whether there was reasonable compliance with rules that the ICC purported to apply in this case.[2] The District Court found that the Caputo statement relied on by the ICC in issuing the new order "fails to show any efforts by the Department of Defense to obtain from existing carriers the service AFL seeks to provide, or the identity of any existing carriers who failed or refused to provide the needed service and the reasons given for any such failure or refusal." 298 F. Supp., at 1011. I

---

[2] The ICC makes no claim that it did not apply its regulations in this case; the insistence is that DOD's supporting statement satisfied the rules. There is, therefore, no occasion to consider the question mooted in the briefs whether, in light of the principle applied in *Service* v. *Dulles*, 354 U. S. 363 (1957), the ICC could depart from its own rules. See also *Vitarelli* v. *Seaton*, 359 U. S. 535 (1959); *Accardi* v. *Shaughnessy*, 347 U. S. 260 (1954); *Yellin* v. *United States*, 374 U. S. 109 (1963); *Bridges* v. *Wixon*, 326 U. S. 135, 153 (1945).

reach the same conclusion from my examination of the statement.

AFL argues that (8) and (9) require information, not action, and that therefore a response that no effort has been made to obtain the service from other carriers is compliance with both items. However, apart from the doubtful premise that in the circumstances of this case the statute would authorize a grant of temporary operating authority without proof of such effort, the argument is foreclosed by the ICC's express finding in its second order that DOD did in fact attempt to obtain the service elsewhere.[3] See *SEC* v. *Chenery Corp.*, 332 U. S. 194, 196 (1947); *Burlington Truck Lines, Inc.* v. *United States*, 371 U. S. 156, 168–169 (1962).

The ICC makes a different argument. It concedes that the DOD statement does not literally comply with (8) and (9) but argues that the content of the statement constitutes reasonable compliance. The ICC insists, therefore, that the protesting carriers were not prejudiced by the lack of specific information. Insofar as this argument rests on the extensive explanation in the DOD statement of the advantages of single-line service, ICC's own rule refutes it. 49 CFR § 1131.4 (b)(4) states:

> "Generally, the desire of a shipper for single-line service in lieu of existing interchange or connecting-carrier service will not warrant a grant of temporary authority. A grant of temporary authority to effectuate single-line service will be authorized only when it is clearly established that the carriers providing multiple-line service are not capable of, or have failed in, meeting the reasonable immediate

---

[3] The ICC expressly found "[t]hat [DOD] has attempted but has been unable to obtain the required and necessary type of service and knows of no carrier in a position to meet its needs."

and urgent needs of shippers or receivers between the points or territories and in respect of the commodity or commodities involved."

Thus it was not enough for the statement to assert simply that DOD desires AFL's single-line service because DOD is interested in economy and efficiency; the requirement is that the statement spell out in detail just what DOD's needs are, why these needs cannot be met by existing carriers, and why the authority applied for will enable AFL to meet the needs. Consequently, in this case reasonable compliance with (8) and (9) means at least compliance sufficient to permit an informed application of the standard set forth in § 1131.4 (b)(4). In my view the DOD statement fails this test. It does not indicate specifically what needs are not being satisfied by the joint- or single-line services provided by existing certificated carriers, or how those needs were brought to the attention of the unsatisfactory carriers so as to discover whether they could improve their performance to meet DOD's needs.

The statement begins by noting that DOD ships a "tremendous volume" of freight between the nine-state area and the five-state area in question, and that "[a] part of this traffic requires that it be transported from origin to destination in the most expeditious manner possible." It adds that "[t]his defense need for speed has not been met in many, many instances by the current certified motor carriers due to a number of factors," among which are the facts that the "majority" of carriers offer only joint-line service, that "virtually all" carriers use regular routes which "often" are circuitous, and that "some" carriers use single drivers instead of two-man teams. The statement then gives three examples of inadequate service. The first two examples show that joint-line service is in these instances

slower than single-line service, but the single-line service cited is currently being provided by a certificated carrier. Thus these two examples do not show that any of DOD's needs are not currently being met. The third example states that in some instances, where single-line service is available over regular routes, service over irregular routes would be faster. But the statement does not identify these instances; it does not state whether DOD brought the inadequacies to the attention of any carrier; nor does it state that to DOD's knowledge there is no way the certificated carriers could speed up their service between the points in question so as to meet DOD's reasonable "immediate and urgent need." This entire segment of the Caputo statement fails substantially to carry out the purpose of Rules 1131.2 (c)(8) and (9) because it does not sufficiently identify what DOD regards as particular inadequacies in current service, so as to permit the protestants to make a focused response and the ICC to make a focused assessment of DOD's asserted needs.

The statement goes on to identify numerous points between which no known certificated carrier is authorized to provide single-line service. But for none of these specific routes does it explain why joint-line service is not or could not be made reasonably adequate for DOD's needs.

The statement next refers to particular situations calling for reliable delivery times, and examples of how present service is unreliable. Again, there is a fatal lack of specific information showing that present service is inadequate. The statement explains that it is often necessary to coordinate arrival of inbound shipments with production schedules at factories. As an example, it cites a situation in which only one of the currently certificated carriers has proven able to meet the delivery schedules, even though other car-

riers were made aware of the need for "timed" deliveries. The one satisfactory carrier cannot transport the entire load. However, the statement does not identify the carriers whose service has been unsatisfactory; it does not say what efforts were made to have them improve their service; and it does not say why they have not conformed to DOD requirements. The same is true of the example of present carriers' failure to make deliveries on time for transshipment outside the United States. It is also claimed that current carriers sometimes lack authority to formulate truckload shipments of diverse commodities, but no examples whatever are cited.

Finally, the statement gives five examples of outstanding service by AFL, and states that in each case DOD experience shows that joint-line carriers could not have met the Department's needs. Again, the unsatisfactory carriers are not identified; their reasons for not improving are not reported; and the "experience" on which DOD bases its assessment of them is not specified.

In sum, the DOD statement fails to supply that concrete evidence of the inability of particular existing carriers to provide the needed service that would enable protestants and ICC to make an informed assessment of AFL's application. Of course, DOD was not called upon to supply the specifics of innumerable instances of inadequate or unavailable service or of every effort to obtain improved service. However, the congressional concern expressed in the statutory limitation demanded that ICC be given at least enough specifics concerning inadequate or unavailable service and efforts to obtain better service so that protestants would have an opportunity for informed rebuttal and ICC the basis for an informed determination. It is of course irrelevant that DOD is the Nation's largest shipper and that its freight consists almost entirely of defense needs. ICC has held that "[w]here necessary facts are lacking" the Govern-

ment is in no better position than any other shipper. *Riss & Co., Inc., Extension—Explosives,* 64 M. C. C. 299, 328 (1955), *National Freight, Inc., Extension—Commodities in Bulk,* 84 M. C. C. 403, 407 (1961).

The Court purports to find in *Estes Express Lines* v. *United States,* 292 F. Supp. 842 (D. C. E. D. Va. 1968), aff'd *per curiam,* 394 U. S. 718 (1969), some support for its glossing over the inadequacies in the DOD statement. In that case an ICC grant of temporary authority was sustained without a showing that efforts had been made to establish whether any other carrier was able to meet the asserted need for the applicant's services. But the differences between that case and the present one are instructive. There the application was supported by statements of 11 separate shippers, each of whom reported that he had previously obtained the service from the applicant, and thus had never sought it elsewhere and, further, knew of no other carrier with the special characteristics of the applicant. The application covered a single route between the District of Columbia and Richmond, Virginia, and thus it could reasonably have been found that protestants were not prejudiced by any lack of information in the supporting statements. In striking contrast, the authority sought by AFL covers transportation between all points in a nine-state area and all points in a five-state area. In my view, where an applicant seeks temporary authority as broad as this, reasonable compliance with Rules 1131.2 (c)(8) and (9) requires more information than DOD provided. Accordingly, I would affirm.