569 F.2d 912
 BARNES FREIGHT LINE, INC., Petitioner,
v.
The INTERSTATE COMMERCE COMMISSION and the United States of
America, Respondents,
Ross Neely Express, Inc., Intervenor-Respondent.
BOWMAN TRANSPORTATION, INC., et al., Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Ross Neely Express, Inc., Intervenor-Respondent.
GEORGIA HIGHWAY EXPRESS, INC., Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Ross Neely Express, Inc., Intervenor-Respondent.
 Nos. 76-2437, 76-2438, 76-2545, 76-2439, 76-2440, 76-2441, 76-2442.
 United States Court of Appeals,
Fifth Circuit.
 March 17, 1978.
 
 Frank D. Hall, Atlanta, Ga., for petitioner, Barnes Freight Line, Inc.
 Arthur J. Cerra, Gen. Counsel, I.C.C., Carl E. Howe, Jr., Griffin B. Bell, U. S. Atty. Gen., Lloyd John Osborn, Atty., U. S. Dept. of Justice, Washington, D. C., for I.C.C.
 Robert S. Richard, William K. Martin, Montgomery, Ala., for Ross Neely Express, Inc.
 Edward G. Villalon, Washington, D. C., Maurice F. Bishop, Birmingham, Ala., for Bowman Transp. et al.
 Phineas Stevens, Jackson, Miss., for Campbell Sixty-Six Express.
 Bates Block, Atlanta, Ga., for Georgia Highway Express.
 William Somerville, Mel P. Booker, Jr., Alexandria, Va., for Baggett.
 Richard R. Sigmon, Drew L. Carraway, Washington, D. C., for Mercury Freight.
 Petitions for Review of Orders of the Interstate Commerce Commission.
 Before WISDOM and GEE, Circuit Judges, and VAN PELT*, District Judge.
 WISDOM, Circuit Judge:
 
 
 1
 These cases concern orders of the Interstate Commerce Commission involving motor carriers' applications for permanent and temporary operating authority. The implications of the cases extend beyond the arcane realm of motor carrier law. They bring into question the integrity of the administrative process in I.C.C. proceedings. We hold that the Commission abused its authority by reinstating the temporary authority of Ross Neely Express. We set aside that order.
 
 I.
 
 2
 The Court consolidated these seven cases for a single hearing. Six involved petitions by carriers for review of Interstate Commerce Commission orders reinstating a voluntarily dismissed application for permanent authority by Ross Neely Express (RNX), and its attendant temporary authority.[1] The seventh was the petition of Barnes Freight Lines, Inc. (Barnes), for review of the Commission's denial to it of similar operating authority. The petitions for review were brought to this Court under 28 U.S.C. § 2321.[2] Both the Commission and the United States were named respondents. 28 U.S.C. § 2322. RNX has intervened in support of the respondents.
 
 
 3
 The events which generated this controversy began in 1973. Cherokee Truck Line, Inc., and Dowda Motor Freight, Inc., were providing interline service between Atlanta and various locations in Alabama. Cherokee had operating authority for the Alabama locations; Dowda had the authority necessary for the Georgia sections of the route. Each company had authority to transport general commodities. In late 1973 Cherokee ceased operations. RNX at that time was authorized to serve many points in Alabama. At the request of a district director of the I.C.C., RNX took over Cherokee's portion of the joint line operations.
 
 
 4
 In 1974 this solution was upset. Dowda went through a change in ownership and emerged as Sun Motor Lines, Inc. Baggett Transportation Co., originally a petitioner here, filed a complaint against both Sun and Cherokee with the I.C.C. As a result of that complaint, Sun and Cherokee agreed to cancel their operating authority. By October 1974, the joint operations between Atlanta and Alabama could no longer continue. RNX had participated in that service for about one year.
 
 
 5
 RNX responded by filing an application for emergency temporary operating authority. This was to allow RNX to maintain by itself what had previously been interline service to Atlanta. The Commission granted the application. In December, RNX applied for temporary operating authority, authorized by Section 210a of the Interstate Commerce Act, 49 U.S.C. § 310a.[3] The Commission granted temporary authority in March 1975 which supplanted the emergency temporary authority. In April RNX applied for the corresponding permanent authority, under 49 U.S.C. §§ 306, 307.[4] Many carriers protested the RNX applications. The Commission scheduled hearings on the application for permanent authority for October 14, 1975, before Joint Board 157.[5]
 
 
 6
 The order scheduling the hearing required RNX to prepare all its direct testimony in written form. This testimony was served on the Commission and the protesting carriers ten days before the hearing. On October 14, 1975, the hearing began with Ross Neely, Jr., president of RNX, testifying. He identified the operating exhibit prepared by RNX for the hearing. After that, the hearing recessed for the day to enable opposing counsel to familiarize themselves with the data underlying the exhibit.
 
 
 7
 When Neely returned to the stand on Wednesday morning, October 15, he faced cross-examination about the RNX exhibits. One exhibit in particular drew a number of questions. This exhibit, Appendix O, purported to be a complete listing of the shipments from Atlanta to Alabama points for the five Tuesdays of April 1975. The point of the appendix was to demonstrate the fast shipping times for RNX service. RNX argued that its service was superior to that of its competitors because it offered substantially one day service. Counsel for the opposing carriers questioned Neely on Wednesday morning concerning the absence of any order in the listing of shipments, as well as the possibility that some records of shipments were missing. App. at 4-10. During the lunch recess Neely, Villalon, the chief counsel for RNX, and John Foster, executive vice president of RNX in charge of shipping, conferred. Foster had compiled Appendix O. RNX contends that Foster admitted at this meeting that he had falsified Appendix O. He had not included records of certain shipments with particularly long transit times.
 
 
 8
 After the lunch-break the cross-examination of Neely resumed. Throughout that afternoon he was questioned about the various RNX exhibits. Neither Neely nor his counsel made any reference to Foster's falsification of Appendix O. When the cross-examination resumed the next morning, Thursday, October 16, Neely continued to testify. Some of the questions again pertained to Appendix O, although RNX contends that none of the questions specifically went to the validity of the appendix. At about 11:30 Thursday morning, questioning returned to the lack of numerical sequence in the records of the shipments in Appendix O. At that time Villalon requested a conference with the Joint Board. In that conference he finally revealed that the appendix was false. App. at 33-52. The Board decided to continue the hearing after a lunch recess, over the objection of the protesting carriers.
 
 
 9
 The afternoon was given over to the testimony of Foster concerning the falsified appendix. He maintained that he acted on his own initiative, out of an excess of zeal for the company's fortunes. In spite of warnings from the Board and counsel for the protestants that he was potentially subject to criminal prosecution under 18 U.S.C. § 1001, Foster chose to testify. He also chose not to retain his own counsel, but relied on counsel for RNX.
 
 
 10
 The next morning the cross-examination of Foster was to continue. Instead, Villalon announced that RNX and Foster had reconsidered their earlier decision to have him testify. On Fifth Amendment grounds, he refused to let Foster take the stand. App. at 153-54. The protesting carriers then attempted to recall Neely and ask him about the appendix. RNX objected to an examination of Neely on that issue. The Joint Board ruled that any cross-examination of Neely would have a scope wide enough to include questions of the falsified appendix. App. at 1509-21. At that point, faced with the prospect of Neely's being subjected to cross-examination on the falsified records, RNX moved to dismiss its application. The hearing recessed. Four days later, the Commission granted RNX's motion to dismiss. With the dismissal of the application for permanent authority, RNX's temporary authority automatically lapsed.
 
 
 11
 The matter rested this way for one week. Then, on October 28, 1975, RNX petitioned the Commission for "reinstatement" of both its application for permanent authority and its temporary operating authority. RNX attached to the petition an affidavit from Neely and statements of support from numerous shippers. The affidavit asserts that after further investigation, Neely discovered that Foster alone was implicated in the falsification. Neely maintained that had he known the true state of affairs, RNX would not have moved for dismissal. Neely averred that 151 employees would lose their jobs if the Atlanta-Alabama authority were not reinstated. He cited the large amount of freight carried by virtue of that authority, and referred to the attached shipper statements as demonstrations of the public interest in the RNX service. Neely reiterated both his personal innocence and that of the corporation, and volunteered to take a polygraph test in support of his affidavit.
 
 
 12
 The protesting carriers opposed the petition for reinstatement, but to no avail. On December 15, 1975, Division 1 of the I.C.C. entered an order reinstating both the permanent authority application and the temporary authority by a two to one vote. The order merely recited that the action was "for good cause appearing". The Division did not discuss either the facts or the reason for its decision. App. 622-23.
 
 
 13
 The protestants responded immediately. On December 20 they wired the Commission a petition seeking to stay the Division's order and to have the matter set for oral argument before the Commission as a whole. They also filed petitions for reconsideration. The same members who constituted the majority of Division 1, now acting as an appellate division, treated the telegraphed petition as a "joint petition", and denied it on January 9. The Commission as a whole did not consider it; indeed, knew nothing about it. The petitions for reconsideration, filed in the usual manner, were denied on April 5, 1976. Neither order denying reconsideration discussed the validity of the reinstatement; the Division did make some conclusory statements.
 
 
 14
 The protesting carriers then took the only remaining step in the Commission's internal appellate process. They petitioned the Commission for a finding that the orders had involved an "issue of general transportation importance" (GTI). If such a finding were made, the issue would be resolved by the entire Commission. Under Commission rules, the determination whether an issue merits that status is made by the entire Commission.[6] The protesting carriers were joined by the Regular Carrier Conference of the American Trucking Association, which sought to intervene with its own petition asking that GTI status be granted. The hopes of the protestants for review by the Commission died aborning. Commission regulations restrict GTI status to those orders which are either administratively final, or which involve hearings with oral presentation of evidence. The Commission's staff summarily decided that neither reinstatement met these criteria. The staff therefore disregarded the petitions as such and simply placed them in a correspondence file. The protesting carriers then filed six petitions for appellate review challenging each reinstatement.
 
 
 15
 The seventh petition, consolidated with these cases, had its source in Barnes' application of November 17, 1975. This occurred after the RNX application was dismissed, and before a ruling was made on the RNX petition for reconsideration. Barnes applied for temporary authority for substantially similar service between Alabama points and Atlanta. Barnes, however, took no position on whether there was an urgent and immediate public need for the service. Instead, it argued that if the Commission were to find such a need existed, a necessary predicate for granting RNX authority, Barnes was a better carrier because no question of fitness clouded its application. Fifty-four shippers supported Barnes; thirteen carriers opposed Barnes, including many of the carriers who are petitioners in these cases. The Commission denied the Barnes application on February 24 and April 30, 1976, after the reinstatement of the RNX authority. The Commission's order denying the application stated in one sentence that Barnes had not shown an immediate and urgent need for the service. No other explanation was given for the action.
 
 II.
 The RNX Application
 A. Jurisdiction
 
 16
 The first legal question in this case is the extent of this Court's jurisdiction over the reinstatement petitions. 28 U.S.C. § 2321(a) vests exclusive jurisdiction in the Courts of Appeals over
 
 
 17
 (A) proceeding to enjoin or suspend, in whole or in part, a rule, regulation, or order of the Interstate Commerce Commission . . . .
 
 
 18
 28 U.S.C.A. § 2321(a) (West Supp.1977). The section further provides that the review shall follow the manner prescribed in Chapter 158 of Title 28. Section 2342, found in that chapter, provides the Courts of Appeals with jurisdiction to review "all rules, regulations, or final orders" of the I.C.C. 28 U.S.C.A. § 2342(5) (West Supp.1977) (emphasis added). This Court's jurisdiction depends on whether the Commission's orders of reinstatement are "final".
 
 
 19
 The parties all agree that the reinstatement of the temporary authority was a final order. Operations which had ceased were resumed, important rights were affected. The reinstatement of the lapsed temporary authority was equivalent to the initial grant of temporary authority, which was subject to judicial review. See e. g., Garrett Freightlines, Inc. v. United States, 9 Cir. 1976, 540 F.2d 450; Superior Trucking Co. v. United States, 1969, N.D.Ga., 302 F.Supp. 257 (three judge district court); Three "I" Truck Lines, Inc. v. United States, 1965, N.D.Iowa, 246 F.Supp. 410 (three judge district court). The dispute centers on the reinstatement of the application for permanent authority. The novelty of the Commission's use of reinstatement leaves us without any authority on point.
 
 
 20
 Two approaches here are possible to the question of finality. The petitioners take a very narrow approach. They point out that the order of dismissal had ended the proceeding and was therefore final. They then argue that the order reviving this dead proceeding must itself be final, as it has conclusively determined that the "final" dismissal would be withdrawn. This approach is too narrow. Every order purports to do something finally, if only to delay a "final" decision. To accept the petitioner's argument could remove all limitations imposed by the Congressional limitation of review to "final" orders.
 
 
 21
 In this case, the second approach to finality is more rewarding. The interests of both the agency and the parties are considered in making the determination.
 
 
 22
 (T)he relevant considerations in determining finality are whether the process of administrative decision-making has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action.
 
 
 23
 Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transport, 1970, 400 U.S. 62, 71, 91 S.Ct. 203, 208, 27 L.Ed.2d 203.
 
 
 24
 The Commission's action in reinstating the application for permanent authority has the effect of assuring that consideration will be given the RNX application. Without the grant of temporary authority, a separate question here, it has no other impact on the rights or obligations of the carriers[7]. The Commission will have an opportunity to review both the fitness of RNX, in light of falsified evidence[8], and the public necessity for the service to be offered. And, it is hoped, the Commission will give a reasoned explanation for its actions. The reinstatement fails both tests of a final order: it will not significantly affect the rights of the parties; and it will prevent complete agency consideration.
 
 
 25
 This Court therefore lacks jurisdiction to consider the Commission's reinstatement of the RNX application for permanent operating authority[9].
 
 B. Standard of Review
 
 26
 The Commission has broad discretion to grant or deny applications for temporary operating authority. It is specifically authorized to take action "in its discretion and without hearings or other proceedings". § 210a(a) Interstate Commerce Act, 49 U.S.C. § 310a(a). These decisions are therefore exempt from the requirements of the Administrative Procedure Act. § 10, Administrative Procedure Act, 5 U.S.C. § 701(a)(2).
 
 
 27
 Some courts have considered that the breadth of the Commission's discretion leaves no room for judicial review in temporary authority cases. See, e. g., M. P. & St. L. Express, Inc. v. United States, 1958, W.D.Ky., 165 F.Supp. 677 (three judge court). The prevailing view, however, is that judicial review exists, but is narrow.
 
 
 28
 From the statutory latitude given the I.C.C. under § 310a(a), and the temporary nature of the decision, it seems obvious that grants of temporary authority should not have to pass the same judicial muster as permanent orders. Therefore, in order to uphold the Commission's decision, we need only find some evidence in the record, so the Commission cannot be said to have acted arbitrarily and capriciously or to have abused its discretion. (Emphasis added).
 
 
 29
 Superior Trucking Co. v. United States, 1969, N.D.Ga., 302 F.Supp. 257, 260-61 (three judge court). See East Coast Transportation Co. v. United States, 5 Cir. 1977, 556 F.2d 741; National Trailer-Convoy Inc. v. Interstate Commerce Commission, 1972, N.D.Okla., 352 F.Supp. 945 (three judge court); H. C. & D. Moving & Storage Co. v. United States, 1970, D.Haw., 317 F.Supp. 881 (three judge court); Bell Lines, Inc. v. United States, 1969, D.W.Va., 306 F.Supp. 209 (three judge court), aff'd, 1970, 397 U.S. 818, 90 S.Ct. 1517, 25 L.Ed.2d 804. The petitioners argue that the suspicious circumstances of this case require broader judicial review than is usual. Because we conclude that the order is invalid even when judged by the usual limited standard of review, we do not reach this contention.[10]
 
 C. The RNX Temporary Authority
 
 30
 Petitioners advance two arguments which question whether the reinstatement of the RNX authority was a proper exercise of discretion. First, they maintain that the Commission has no legal power to reinstate matters which have been voluntarily dismissed. Second, they contend that, in these circumstances, reinstatement was arbitrary and capricious.
 
 
 31
 If the Commission is in fact without authority to reinstate dismissed matters, then the order would have to be set aside. The narrow review of temporary authority determinations envisioned by § 310a(a) must encompass actions beyond statutory authorization. Petitioners argue from the absence of specific provision for petitions for reinstatement in both statutory law and the Commission's own regulations that no such power exists.
 
 
 32
 The Commission is, however, empowered to reconsider its orders. 49 U.S.C. § 17(6). Upon reconsideration, it may change its decision.
 
 
 33
 If after rehearing, reargument, or reconsideration of a decision, order, or requirement . . . it shall appear that the original decision, order, or requirement is in any respect unjust or unwarranted, the Commission or appellate division may reverse, change, or modify the same accordingly.
 
 
 34
 49 U.S.C. § 17(7). Although the applicant in this case requested dismissal, such dismissals are not granted automatically by the statute. See, e. g., Seattle Traffic Ass'n v. Consolidated Freightways, Inc., 1957, 301 I.C.C. 483, 486; Royster Guano Co. v. A.C.L.R.R. Co., 1918, 50 I.C.C. 34, 40. Although most of the litigation has arisen in the course of Commission actions reconsidering granted authority, those cases have broadly construed the Commission's power to reopen proceedings. See Alamo Express, Inc. v. United States, W.D.Tex.1965, 239 F.Supp. 694, 697-98 (three judge court), aff'd 1965, 382 U.S. 19, 86 S.Ct. 83, 15 L.Ed.2d 14. See also American Farm Lines v. Black Ball Freight Service, 1969, 397 U.S. 532, 540-42, 90 S.Ct. 1288, 25 L.Ed.2d 547. The Commission's action in reinstating the RNX authority should be considered action on reconsideration. The title RNX attached to its petition, seeking "reinstatement" rather than "reconsideration", is not determinative of the nature of the requested action.
 
 
 35
 The petitioners also argue that the Commission's rules make no provision for a reinstatement. The rules, however, do provide for petitions for reconsideration. Rule 101, 49 C.F.R. § 1100.101. Commission Rule 102 allows petitions not specifically covered by the Rules.
 
 
 36
 When the subject matter of any desired relief is not specifically covered by the rules in this part, a petition seeking such relief, which relief shall be construed as including appropriate discovery procedures, and stating the reasons therefore may be served and filed.
 
 
 37
 49 C.F.R. § 1100.102. Petitioners are put in the uncomfortable position of arguing that the relief sought was specifically in the rules, and hence not subject to a petition under Rule 102; but that the label on the petition prevented the Commission from considering it under Rule 101.
 
 
 38
 Our rejection of the petitioners' argument is bolstered by the great latitude given the Commission in enforcing its rules. In American Farm Lines v. Black Ball Freight Service, 1969, 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547, protesting carriers argued that the Commission failed to abide by its rule specifying the format of shipper support statements. The Court rejected a rigid application of the rule.
 
 
 39
 "The Commission is entitled to a measure of discretion in administering its own procedural rules in such a manner as it deems necessary to resolve quickly and correctly urgent transportation problems.
 
 
 40
 (T)here is no reason to exempt this case from the general principle that '(i) t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. . . .' N.L.R.B. v. Monsanto Chemical Co., 205 F.2d 763, 764."
 
 
 41
 397 U.S. at 538-39, 90 S.Ct. at 1292. The Court distinguished between rules designed to assist the Commission, and rules designed to "confer important procedural benefits upon individuals". As in American Farm Products, the rule in this case falls within the former category.
 
 
 42
 Petitioners also argue that this reinstatement is invalid under Rule 247(f), C.F.R. § 1100.247(f). That rule bars new applications by parties who have had earlier applications dismissed for failure to prosecute. The new applications are barred for one year, unless good cause is shown for waiver. Whatever the sins of RNX, they did not include failure to prosecute its applications. The rule is irrelevant to the case. The Commission did have the power to reinstate the RNX temporary authority.
 
 
 43
 The next question is whether the Commission abused that power. We hold that it did.
 
 
 44
 There is little precedent dealing with situations similar to this one. The cases dealing with abuse of discretion under § 310a(a) have concerned the Commission's determinations of immediate and urgent need, or the absence of existing service. It is to those particular facts that the "some evidence" standard has been applied. This pattern in the precedents creates a trap. Because all the abuse of discretion questions have involved these factual determinations, the appropriate inquiry, whether some evidence supports the Commission, may be seen as exhausting the power of the courts to review. This is not the case. The Commission's action may be arbitrary and capricious even if some evidence supports its findings. The shippers' statements and past tonnage records relied upon by RNX would provide sufficient support for a grant of temporary authority. See, e. g., Garrett Freightlines, Inc. v. United States, 9 Cir. 1976, 540 F.2d 450 (statements of employees and supporting statements of 121 shippers sufficient). But the issues in question are not issues of the need for the RNX service, nor the availability of other carriers. This case brings into question the integrity of the administrative process.
 
 
 45
 The actions of the applicant were deceitful; intended to work a fraud on the Commission. The overnight-service contention of RNX was the centerpiece of its argument for its application. The crucial piece of evidence for that contention was crudely falsified. Then, even assuming that the falsification was solely the idea of Foster, higher levels of the company became involved. RNX admits that its counsel and its president became aware of the falsification on Wednesday around noon. Yet, rather than immediately admit the falsification, Neely continued to testify that afternoon about the RNX exhibits, including Appendix O, and the following morning until 11:30. Neely and Villalon may not have hoped to cover up the controversy. It is possible that they sought additional time, hoping they could both determine the scope of the falsification and remedy it. But the absence of proof of an unsavory motive does not mean they acted properly. When a lawyer discovers a fraud upon a court, he must "promptly reveal the fraud to the affected person or tribunal". A.B.A. Code of Professional Responsibility, DR 7-102(B) (emphasis added).[11] Finally, RNX did not blindly choose to dismiss its application. It did so because that was the only way it could avoid further cross-examination of Neely. And it did so realizing that RNX was paying a high price.
 
 
 46
 (Villalon) As I understand the guidelines of permissible cross examination as stated by the Joint Board, considerable latitude would be permitted in cross examination of Mr. Neely and in answering certain questions, which I am sure would be asked, he would find himself in the position of possibly implicating other people in the employ of his company.
 
 
 47
 Recognizing the economic effect of the step that he has elected to take, for the reasons I have just stated, Applicant moves to dismiss the application.
 
 
 48
 App. at 1519.
 
 
 49
 The actions of the Commission did not serve to reduce the taint on these proceedings. The reinstatement petition was granted solely on the basis of the Neely affidavit. This, of course, was a self-serving statement by a man who, when given the opportunity to explain his version of the false records, refused to be cross-examined. The Commission conducted no hearings into any of the matters which that affidavit covered. No independent investigation of the perjury and the false records was conducted before the reinstatement.[12] The Commission did not inquire into Neely's own knowledge of his company's shipping operations nor of his relationship with Foster, the Company's executive vice president. The Commission acted on very limited information when it reconsidered its dismissal. A further disturbing fact is the failure of the Commission, at any level of its review, to provide a reasoned explanation for the reinstatement. The most expansive comment by the Commission was that the order was "for good cause appearing".
 
 
 50
 Thus, without either investigation or opinion, the Commission reinstated the temporary authority of RNX after RNX offered admittedly false evidence. For two years now RNX has used that authority, conveying goods between Atlanta and Alabama. And after two years there has yet to be any Commission action on the fraud and perjury. In reviewing Commission action we are not to act as a Commission ourself, nor are we entitled to correct decisions we think are wrong. But neither must we hold our noses and close our eyes while the Commission rewards a wrongdoer. As Judge Rives has said, judges "must refuse to enforce administrative orders which they find to be unjust . . ." N.L.R.B. v. Rex Disposables, Division of DHJ Industries, Inc., 5 Cir. 1974, 494 F.2d 588, 592. The Commission's order in this case is unjust; and it is arbitrary and capricious. Faced with this record, no reasonable administrative agency should grant this applicant anything beyond an investigation. We therefore set aside the order of the Commission which reinstated the RNX temporary authority.
 
 
 51
 The petitioners have raised many other issues, including allegations of ex parte attempts by political figures to influence the Commission in favor of RNX. The petitioners also contend, with justification, that they experienced a complete failure to obtain adequate review within the Commission. We do not consider these issues because of our conclusion that the reinstatement was arbitrary and capricious.
 
 III.
 
 52
 Barnes has petitioned for review of the Commission's order denying its application for substantially similar authority. That application was denied in February 1976, after the reinstatement of the RNX temporary authority. The denial stated merely that Barnes had failed to prove an immediate and urgent need for the service.
 
 
 53
 No fraud has been alleged to have touched directly the Barnes application. Judged under the usual standards, the Commission did not act arbitrarily or capriciously in denying the Barnes application. There already was a carrier authorized to perform similar service RNX. Assuming that the Commission reviewed the Barnes application simultaneously with the RNX petition for reinstatement, then the "some evidence" test appears to have been met. The specific authorizations are slightly different; RNX had a more well developed route structure in Alabama; and the amount of shipper support varied. For purposes of temporary authority, such minor differences are sufficient bases for Commission action. That calculation, however, was predicated on the availability of RNX to provide the service. After our decision in the RNX cases, RNX service is no longer immediately available. Therefore, we vacate the order denying the Barnes application and remand the case for further consideration.
 
 IV.
 
 54
 This case has revealed a shocking combination of carrier malfeasance and Commission action that is both unexplained and, on the record, inexplicable. Courts of Appeals are not expert at evaluating the transportation requirements of the country and should defer, appropriately, to the Commission's broad discretion and expertise. We do try, however, to develop some expertise about integrity. In overseeing the administrative process, our primary goal should not be to insure " correct" decisions, but to preserve the integrity of the decision-making process. That goal demands that we reverse the Commission in this proceeding.
 
 
 55
 The order of the Commission dated December 11, 1975, is REVERSED insofar as it reinstated the temporary authority granted in proceedings docketed as MC-99610. The order of the Commission dated February 24, 1976, denying the application for temporary authority docketed as MC-108663, is VACATED and REMANDED for further proceedings in light of this opinion.
 
 
 
 *
 Senior District Judge of the District of Nebraska, sitting by designation
 
 
 [1]
 Temporary authority may be granted by the Commission for a period not to exceed 180 days. After an application for a certificate of convenience and necessity has been made, the Commission has, by rule, provided that it may extend the period of the temporary authority until a final decision on the application for a certificate. 49 C.F.R. § 1101.1
 
 
 [2]
 That section provides that
 (a) Except as otherwise provided by an Act of Congress, a proceeding to enjoin or suspend, in whole or in part, a rule, regulation, or order of the Interstate Commerce Commission shall be brought in the court of appeals as provided by and in the manner prescribed in chapter 158 of this title.
 This section was amended in 1975, at which time review was lodged in the Courts of Appeals. Previously, three-judge district courts had jurisdiction over such proceedings under 28 U.S.C. § 1336, § 2325 (repealed, 1975).
 Chapter 158 of Title 28, 28 U.S.C. §§ 2341-53, governs the method of review for orders of the FCC, the Federal Maritime Commission or Maritime Administration, the then Atomic Energy Commission, and various orders by the Secretary of Agriculture. In 1975 "all rules, regulations, and final orders" of the I.C.C. were added to the list (emphasis added).
 
 
 [3]
 The section reads
 (a) To enable the provision of service for which there is an immediate and urgent need to a point or points or within a territory having no carrier service capable of meeting such need, the Commission may, in its discretion and without hearings or other proceedings, grant temporary authority for such service by a common carrier or a contract carrier by motor vehicle, as the case may be. Such temporary authority, unless suspended or revoked for good cause, shall be valid for such time as the Commission shall specify, but for not more than an aggregate of one hundred and eighty days, and shall create no presumption that corresponding permanent authority will be granted thereafter.
 
 
 [4]
 Permanent authority is the phrase used in motor carrier litigation for a certificate of convenience and necessity. Such certificates require a showing different from that of the temporary authority. The applicant must be "fit, willing, and able properly to perform the service proposed" and the service must be "required by the present or future public convenience and necessity", 49 U.S.C. § 307(a) or fall within one of the "grandfather clauses". See 49 U.S.C. § 306. The scope of review of these determinations is much broader. The courts judge them by the "substantial evidence" test, rather than the "arbitrary and capricious" standard applied to temporary authority applications. See the comparison in H.C. & D. Moving & Storage Co. v. United States, 1970 D.Haw., 317 F.Supp. 881, 883 (three judge court)
 
 
 [5]
 Mr. Carl Evans, general counsel for the Alabama Public Service Commission, constituted Joint Board 157. He was assisted by Mr. Burrups, an attorney with the Interstate Commerce Commission. See generally 49 U.S.C. § 305(a)-305(c) (nature and uses of Joint Boards)
 
 
 [6]
 The procedures involving issues of general transportation importance are created by Commission Rule 101(a)(3), 101(a)(4), under the authority granted the Commission in 49 U.S.C. § 17(6) to limit reconsideration
 (T)he right to apply to the entire Commission for rehearing, reargument, or reconsideration of a decision, order, or requirement of a division of the Commission in any proceeding shall be limited and restricted to those proceedings in which the entire Commission, on its own motion, determines and announces that an issue of general transportation importance is involved (emphasis added).
 
 
 [49]
 C.F.R. § 1100.101(a)(3). Rule 101(a)(4) sets out the procedures for petitioning for such a finding, and limits GTI cases to those which involve the taking of evidence at an oral hearing
 
 
 [7]
 Of course, if the decision on the temporary authority were different, the decision on the application for permanent authority would substantially affect the petitioners' rights. If we were to reverse the Commission as to the permanent authority, the temporary authority would fall automatically, because over 180 days have passed since the first grant of temporary authority. See note 1
 
 
 [8]
 The petitioners express concern in their briefs about the "de novo" nature of the new hearing ordered by the I.C.C. The government maintains that this does not prevent the issue of fitness, and therefore the events of October 1975, from being argued at the new hearing. It means only that the new hearing will procedurally start from a blank slate. We agree with the government that the false evidence should be an issue in any new hearing on an RNX application
 
 
 [9]
 Our conclusion is bolstered by the fact that RNX has pending with the Commission an application for permanent authority which substantially duplicates the application in question. If we reversed the Commission's reinstatement of the permanent application in this case, the Commission might well proceed to hear the other application. Currently, that application is being held in abeyance pending the decision of this Court. Commission orders of June 2, 1976, and July 6, 1976, in MC-99610
 
 
 [10]
 Arguably, the level of review might be controlled by the fact that the order was one of reinstatement, without regard to the standard of review applicable to the proceeding being reinstated. The paucity of precedent dealing with orders of reinstatement makes it reasonable here, as in finality, to let the nature of the underlying proceeding govern this determination. This is particularly true of a temporary authority, which may be granted or denied without a hearing in much the same manner as this petition for reinstatement
 
 
 [11]
 See also Code of Ethics for Practitioners Before the Interstate Commerce Commission, Canons 1, 2, 23, 29, 37, and 38. 49 C.F.R. § 1100, Appendix A. We do not mean to suggest that Mr. Villalon should be subjected to professional discipline. As far as the record shows, he was extremely candid and helpful concerning this matter after he came forward and disclosed the falsification. The twenty-four hour delay might or might not be considered "prompt", but in this case it may have been motivated by the desire to set the true statistics, and the data underlying those statistics, before the Joint Board
 
 
 [12]
 The absence of hearings and investigations distinguishes this case from Kidd v. F.C.C., 1962, 112 U.S.App.D.C. 288, 302 F.2d 873. In that case the Court upheld a grant by the Commission to a perjuring applicant. The Commission acted after investigation and hearings into the question of perjury. Not only was the matter the subject of proceedings before a hearing examiner, but the Commission itself heard oral argument on it. The Commission filed an opinion granting the license. As the Court noted, "Here, the Commission considered and adequately dealt with the major contentions advanced by appellant". 112 U.S.App.D.C. at 289, 302 F.2d at 874. The same cannot be said of the I.C.C. in this case
 During oral agreement, we were informed that investigations are being conducted by the Commission's Bureau of Investigations, as well as by the Department of Justice. At that time, the investigations had not been completed. Obviously, they did not affect the Commission's reinstatement of the temporary authority, which occurred over two years ago.