**LONGVIEW CROP INSURANCE AGENCY, Plaintiff,**

**v.**

**The UNITED STATES, Defendant,**

**and**

**National Association of Crop Insurance Agents, Third–Party Defendant.**

**NATIONAL ASSOCIATION OF CROP INSURANCE AGENTS, Plaintiff,**

**v.**

**The UNITED STATES, Defendant,**

**and**

**LongView Crop Insurance Agency, Third–Party Defendant.**

Nos. 122–88C, 312–88C.

United States Claims Court.

June 6, 1990.

Marc D. Flink, Denver, Colo., for Long-View Crop Ins. Agency.

Larry M. Rosenstein, Washington, D.C., for National Ass'n of Crop Ins. Agents.

Stephen J. McHale, with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, Director, Washington, D.C., for defendant U.S.

## OPINION

ANDEWELT, Judge.

These two related government contract actions are consolidated for purposes of this decision. In their respective actions, plaintiff LongView Crop Insurance Agency (LongView) and plaintiff National Association of Crop Insurance Agents (NACIA) each seeks damages relating to its service as a "master marketer" of crop insurance policies under a contract with the Federal Crop Insurance Corporation (the FCIC). NACIA is a third-party defendant in Long-View's action (No. 122–88C), and LongView is a third-party defendant in NACIA's action (No. 312–88C). Each action is presently before the court on cross-motions for summary judgment by the respective plaintiff, defendant United States, and the respective third-party defendant. For the reasons explained herein, in each case, defendant United States' motion for summary judgment is granted, the respective plaintiff's motion is denied, and the respective third-party defendant's motion is denied as moot.

### I.

Pursuant to the Federal Crop Insurance Act of 1980, 7 U.S.C. § 1507(c), the FCIC entered into sales and agency contracts, known as master marketing agreements, with LongView and NACIA. Under the terms of these agreements, LongView and NACIA sold and serviced FCIC crop insurance policies and in return received a commission based on a flat percentage of policy premiums. The individual policies provided, in effect, that unless canceled by the applicable cancellation date, the policies automatically would be renewed to cover the next seasonal crop.

The dispute herein involves entitlement to commissions on approximately 1000 crop insurance policies for two distinct periods: (1) crops seeded during the fall of 1985 (*e.g.*, winter wheat) for which the policy cancellation date was September 30, 1985; and (2) crops seeded during the spring of 1986 (*e.g.*, spring wheat) and thereafter. NACIA originally was the master marketer for all of the policies in issue. However,

after agents who serviced the policies for NACIA went to work for LongView, Long-View submitted requests to the FCIC seeking transfer of the policies to LongView. These requests, submitted between approximately September 1, 1985, and January 31, 1986, were each signed by the policy holder prior to the September 30, 1985, policy cancellation date for the fall 1985 crop seedings. In response to these transfer requests, the FCIC mailed to LongView and NACIA documents known as "data-mailers" which gave LongView agents authority to acquire the contract folders from NACIA.

NACIA objected to the FCIC's acceptance of LongView's transfer requests. The FCIC's Kansas City Office held a hearing on February 12, 1986, and in a May 16, 1986, decision, permitted the transfer to LongView of all policies in dispute. However, regarding commissions, the Kansas City Office awarded to NACIA the commissions covering those policies for the fall 1985 crop seedings that the FCIC had not actually transferred to LongView prior to the September 30, 1985, policy cancellation date.

Both LongView and NACIA appealed the decision of the Kansas City Office to the FCIC's national office. LongView argued that the date the policy holders signed the transfer requests was crucial in assessing entitlement to commissions and, therefore, that it was entitled to the commissions for all fall 1985 crop seedings because the policy holders had signed the transfer requests prior to the applicable September 30, 1985, policy cancellation date. NACIA disagreed and contended that it was entitled to the commissions for all fall 1985 crop seedings. In addition, however, NACIA argued that the FCIC should have refused to transfer the policies to LongView because Long-View's transfer requests were defective for a variety of reasons. NACIA argued that since LongView had never filed valid transfer requests, NACIA was entitled not only to commissions for fall 1985 crop seedings but also to commissions for spring 1986 crop seedings, which had a policy cancellation date of April 15, 1986.

After a hearing, on May 26, 1987, the FCIC issued a final agency decision affirming its Kansas City Office's prior determination. The FCIC held that the crucial date for determining entitlement to the commissions sought by LongView was the date the FCIC issued the data-mailers rather than the date the policy holders signed the transfer requests.[1] As to NACIA's allegation that LongView's transfer requests should have been denied as defective, the FCIC held that none of the alleged deficiencies was sufficient to warrant such a denial. Pursuant to the May 26, 1987, final decision, NACIA received the commissions for all policies for the fall 1985 crop seedings that had not been transferred by the FCIC prior to the September 30, 1985, cancellation date, and LongView received the commissions for all policies for the spring 1986 crop seedings since those policies had been transferred by the FCIC well before the April 15, 1986, cancellation date.

Thereafter, LongView and NACIA each submitted a certified claim under its respective contract seeking the monies it had been denied as a result of the FCIC ruling. NACIA's claim, filed April 26, 1988, sought all commissions it would have earned up through the date of its claim had its policies not been transferred. After each of their claims was denied, LongView and NACIA each filed suit in this court pursuant to the Contract Disputes Act, 41 U.S.C. § 601, *et seq.* At defendant's request and pursuant to RUSCC 14(a)(2), the court summoned NACIA as a third-party defendant in LongView's action, and LongView as a third-party defendant in NACIA's action. Defendant contended that since LongView had been paid the commissions NACIA was seeking in its suit, and NACIA had been paid the commissions LongView was seeking in its suit, each was contingently liable for the commissions sought by the other.

## II.

▮ In its suit, LongView contends that the FCIC was wrong in awarding NACIA commissions for the fall 1985 crop seedings because the date the transfer requests were signed by the policy holders, rather than the date of the data-mailers, was controlling in determining entitlement to commissions.

The transfer of policies among master marketers is covered under Section IX of the master marketing agreement. While Section IX(B) provides that "[a] Contractor may accept the transfer of a policy at any time during the crop year," Section IX(E), which covers entitlement to commissions, provides, in effect, that the transferee does not necessarily receive all commissions for that crop year. Section IX(E) provides:

> The Contractor shown by the Corporation on the Corporation's records to be responsible for the servicing of the policy on the cancellation date for the crop will be entitled to the Commission on amounts collected prior to debt termination for that crop (when due).

LongView argues, in effect, that the transfer requests signed by the policy holders are the pertinent "corporate records" and that the date the policy holders signed those requests is the crucial date for determining who was the contractor "responsible for the servicing of the polic[ies] on the cancellation date for the crop." But other subsections of Section IX belie such an interpretation.

Section IX(C) provides that "[t]he receiving Contractor agrees to provide service by an authorized agent ... to the policyholder on all policies covered by the transferred contract." By using the past tense of the verb transfer, *i.e.,* "transferred," Section IX(C) obliges the contractor to service the contract only after the contract has actually been transferred. Section IX(A) provides that transfers must be "authorized" by the FCIC.[2] Section IX(D), which controls the date a transfer is effective, pro-

---

1. The FCIC concluded that "[i]f the data-mailer[s were] issued after the [September 30] cancellation date of that crop, the commission[s] for [those] polic[ies] will belong to NACIA."

2. Section IX(A) provides that "[t]ransfer of a policyholder's contract between Contractors is limited to one transfer per crop year which *must be authorized* by the policyholder and the [FCIC]" (emphasis added).

vides that "[t]he transfer is effective upon notification to the Contractor of acceptance of the transfer by the Corporation." Hence, under the contract, until the FCIC notified LongView of its "acceptance of the transfer," there was no "authorization" for the transfer (Section IX(A)), the transfer was not "effective" (Section IX(D)), and LongView was not obliged "to provide service" (Section IX(C)) and, hence, was not "the contractor shown ... on the Corporation's records to be responsible for the servicing of the policy" (Section IX(E)).

LongView's signed transfer requests were simply that—requests. They did not indicate authorization or constitute an acceptance by the FCIC of the transfers and, hence, did not themselves result in a transfer or establish a transfer date. Thus, the transfer requests cannot constitute corporate records showing which contractor was "responsible for servicing the polic[ies]." Rather, the first response by the FCIC to LongView's transfer requests that possibly could be interpreted as a notice of acceptance was the data-mailers. Hence, the FCIC correctly held that the date of the data-mailers was controlling and that NACIA, and not LongView, was entitled to the fall 1985 crop seeding commissions for those policies on which the FCIC issued data-mailers after the September 30, 1985, policy cancellation date.

### III.

LongView's arguments to the contrary are not convincing. First, LongView contends that the FCIC's decision to award NACIA the commissions covering the fall 1985 crop seedings was contrary to the FCIC's then-existing practice. LongView notes that at the time its transfer requests were signed, the FCIC did not send out letters to indicate that the requests had been accepted and that the FCIC's comput-

er was programmed to distribute commissions based on the date the transfer requests were signed. LongView argues that the data-mailers, which the FCIC commenced sending out in June 1985, shortly before the policy holders signed the transfer requests, were intended only to authorize a transfer of files and not to indicate acceptance or establish a transfer date. LongView also contends that it would be unfair to rely on the data-mailers because their issuance was subject to FCIC processing delays beyond LongView's control.

But, as explained above, the FCIC's prior practice notwithstanding, the express terms of the contract provide that until there is some form of notification, a requested transfer simply is not effective. The data-mailers were the first notification to LongView that the FCIC had accepted the transfer requests. Therefore, whether or not so intended, the data-mailers fulfilled the contract notification requirement. Moreover, the data-mailers bore the date the FCIC first input the transfer information into its computer. Until the transfer was noted in the computer, there apparently was no FCIC record indicating the transfer requests were approved. Hence, prior to the date of the data-mailers, there was no "corporate record" (as referred to in Section IX(E) of the contract) indicating LongView was "responsible" for servicing the policies.[3]

Second, LongView contends that the FCIC's instructions for completing the forms the policy holders used to request transfers (Forms 481 and 515) indicate that LongView was responsible for servicing the contracts as of the date it signed the forms. With respect to dating the forms, the instructions for Form 515 state: "Enter the date the insured signed this form. This determines the date of the transfer." The

---

3. To support its argument that the FCIC had always interpreted the date the policy holder signed the transfer request as crucial, LongView points to a 1987 amendment to its master marketing agreement which resulted in the contract providing that "[a] crop insurance contract may be transferred from the Contractor to another Contractor only with the approval of the insured and of the Corporation. ... Such trans-

fer is effective when approved by the insured. *Approval by the Corporation will be presumed* unless the Corporation mails notification of rejection" (emphasis added). But this 1987 amendment made a significant change in the contract language. There was no such presumption of approval included in the earlier version in issue in this litigation.

instructions for Form 481 state: "Enter the agreed upon transfer date. This will determine the correct year of the transfer for commission purposes."

These instructions potentially produce some ambiguity as to the effective date of a transfer. But, since the contract unambiguously requires notification of acceptance prior to a transfer becoming effective, the crucial question becomes whether the forms and their instructions in some way amended the contract so as to make a transfer effective prior to such notification. The answer is no. There is nothing in the forms or their instructions to suggest any mutual intent to amend the contract requirements.

Indeed, viewed *in toto,* the forms generally indicate an intent to follow the contract requirements. First, the title of each form unequivocally indicates that the form constitutes only a *"Request"* for a transfer and does not itself produce a transfer. Form 481 is entitled "Policyholder *Request* for Change of Federal Crop Insurance Service Office Effective for 19__ and Succeeding Crop Years" (emphasis added). Form 515 is entitled *"Request* for Transfer of Federal Crop Insurance Contract Effective for the 19__ and Succeeding Crop Years" (emphasis added). Consistent with these titles, FCIC personnel routinely reviewed transfer requests and refused to transfer a policy if the reviewer determined, for whatever reason, that a transfer was not warranted.

Next, each form indicates on its face, in effect, that the responsibility for servicing a contract does not fully shift to the transferee until the FCIC accepts the transfer. Each form states: "I understand that *upon acceptance* of this change by the Kansas City Office ALL servicing for this contract will be handled by the [transferee agent] listed below" (emphasis added). LongView does not contend that the FCIC engaged in any act indicating to LongView its acceptance of a change in master marketers prior to sending the data-mailers. Finally, Form 481 appears to seek consistency with the general requirements of the contract by stating: "It is understood that

the master marketing company of record on the established transfer date for the crop year will be entitled to the commission payment."

Thus, the contract provisions are unambiguous and have not been amended. NACIA was the firm "shown by the Corporation on the Corporation's records to be responsible for the servicing of the polic[ies] on the cancellation date for the crop" and, hence, under the contract NACIA was entitled to the commissions LongView seeks for those policies for the fall 1985 crop seedings. Therefore, defendant's motion for summary judgment in LongView's action is granted, plaintiff LongView's motion for summary judgment is denied, and third-party defendant NACIA's motion for summary judgment is denied as moot.

## IV.

In its suit, NACIA contends that the FCIC's approval of the transfers to LongView was inconsistent with the FCIC's established procedures and constituted a breach of the FCIC–NACIA master marketing agreement. The pertinent procedures are found in FCIC Notice N8–217 (Notice 217) which is entitled "Procedure for Movement of Crop Insurance Policies." Notice 217, which was issued after NACIA entered its master marketing agreement, provides that "the transfer ... of FCIC policies among ... FCIC Master Marketing Companies ... will be handled within the guidelines established by this procedure." Notice 217 provides, *inter alia*:

2.  A Master Marketing Company [seeking transfer] has sole responsibility to assure that:

    \*    \*    \*    \*    \*    \*

    B *The transfer forms are properly prepared ...*

    C *Signatures required are that of the policyholder,* assuming company representative and an authorized official of the assuming Master Marketing Company.

    D *Forms are submitted to the [FCIC Kansas City Office]* within 30 days after the policyholders signature and date.

3. FORMS:

A FCIC–515—Use to Request:

\*    \*    \*    \*    \*    \*

2 Transfer of a contract when a request is made to transfer the policy from one Master Marketing Company to another.

(Emphasis in original.) Under the heading "General Provision," the notice provides: "Transfer requests which appear to be of questionable validity will be returned to the originating Master Marketing Company."

NACIA contends that the transfer requests accepted by the FCIC run afoul of Notice 217 guidelines and, therefore, should have been found to be of questionable validity and rejected. In this action, NACIA relies upon the same alleged procedural violations it relied upon unsuccessfully before the FCIC. NACIA's allegations and the FCIC's responses in its final decision are as follows.

(1) NACIA alleges that LongView submitted numerous transfer requests (approximately 622) on Form 481 instead of the proper Form 515, as contemplated in Notice 217. In response, the FCIC stated:

FCIC finds that although the FCIC–481 was not the proper form for such a transfer request the use of the form does not make the transfer invalid.

\*    \*    \*    \*    \*    \*

[Norman Stock, who was responsible for reviewing and approving all transfer requests for FCIC] testified that ... he routinely accepted the FCIC 481 and FCIC 515 for the purpose of transfer from one master marketer to another. The information required for processing a transfer of a contract is on both the FCIC–481 and FCIC–515. FCIC procedure does not state that the use of FCIC–481 invalidates a request for a transfer. The transfer form FCIC–481 was never made obsolete by FCIC. FCIC finds that the transfer requests made on the FCIC–481 are valid.

(2) NACIA contends that, contrary to Notice 217, LongView submitted to the FCIC at least 135 transfer requests more than 30 days after the policy holders had

signed them. The FCIC responded to this argument as follows:

[The language of Notice 217 referring to 30 days] does not indicate that the transfer would not be acceptable if submitted later than 30 days. This is an administrative guideline intended to prevent unreasonable delays in processing transfers. Mr. Stock testified that he routinely accepted transfers up to 45 days after the insured's date of signature to allow for mail time and mis-routing of documents within [the FCIC's Kansas City Office].

(3) NACIA alleges that a LongView agent entered the date of the policy holders' signatures on certain transfer forms. The FCIC responded:

[T]he pre-dating of the transfer forms would not invalidate the transfer. The only advantage to be gained by the agent would be to avoid a potential rejection ... for failing to submit the form 30 days after the insured's signature. Testimony by the agent ... found that she only intended to assist the farmer by pre-dating transfers. FCIC does not condone mis-dating of insurance documents, however it has no bearing on the validity of the transfer. The intent to transfer the contract was clearly expressed by the insured and FCIC will honor that request.

(4) NACIA alleges that LongView agents misdated their own signatures on certain transfer forms. In response, the FCIC stated:

[T]his would not be cause to invalidate the transfer request. NACIA raises the objection that [LongView] date-stamped the transfer forms with the same date as the policyholder's signature date. FCIC finds no advantage to be gained by [LongView] by doing so or that it in any manner resulted in harm to NACIA or FCIC. [LongView's president] testified that this was done to ensure the policyholder's service was not interrupted during the transfer process.

(5) NACIA contends that LongView representatives improperly changed the dates of the policy holders' signatures on certain

transfer forms. In response, the FCIC stated:

> [T]his does not invalidate the transfers. Mr. Stock testified that this matter was the result of instructions given to [LongView] by the Director of Kansas City Operations (KCO) [for the FCIC], Mr. Ivan Dull. Mr. Stock had initially rejected the contracts in question for being more than 45 days from the date of insureds signature to the date received in KCO. Mr. Dull gave verbal instruction to Mr. Vons [president of LongView] and Mr. Stock that the substitution by the agent of the signature date to conform with the 30 day rule would be allowed if done with the insured's permission. Mr. Vons testified that all insureds were contacted by phone and all consented to the change. No testimony was heard which indicated that the insureds were not contacted or did not give consent to the change of date.

(6) NACIA faults LongView for having stamped on certain of the transfer requests agents' names and addresses and the words "Federal Crop Insurance Corporation." NACIA alleges that this stamping was inconsistent with Section 12 of the contract, which states in part:

> The contractor and its representatives will not engage in any practice; perform in any manner; print, publish or use any advertising or printed material that makes direct reference to Federal Crop Insurance, the Corporation or the United States Department of Agriculture or their symbols or abbreviations except that which is furnished by or approved in writing by the Corporation.

In response to this infraction, the FCIC stated:

> [A]lthough this is a violation of the Contract it would not invalidate the trans-

fers. FCIC prohibits the use of such reference in an effort to prevent the deception of producers that the agent is a direct contractor of FCIC.

> FCIC procedure does not state that such an infraction will result in invalidation of a transfer request. It is clearly the intent of the insured to transfer his policy to the new contractor and FCIC will honor that request. The violation of a contract provision by [a LongView] agent would not render the transfer invalid. It is clearly the intent of the insured to transfer his policy to a new contractor and FCIC will honor that request.

### V.

█ NACIA disputes the FCIC's reasoning. NACIA contends that its master marketing agreement requires the FCIC to comply with all FCIC procedures, including subsequently issued Notice 217,[4] and that the FCIC's acceptance of transfer requests that failed to comply with Notice 217 guidelines constitutes a breach of NACIA's master marketing agreement.[5] In response, defendant contends that the FCIC was not obliged under the master marketing agreement to reject the transfer requests for failure to comply with the guidelines in Notice 217 and that the FCIC could, in an exercise of agency discretion, accept such requests. Defendant is correct.

NACIA makes a series of arguments to support its contention that the FCIC was contractually obliged to reject any transfer request that did not comply with the literal terms of Notice 217. First, NACIA contends that all FCIC procedures, including Notice 217, were incorporated by reference into the master marketing agreement. But scrutiny of the relevant contract provisions does not support this argument. There are

---

**4.** NACIA signed its master marketing agreement on August 8, 1984, and Notice 217 was issued on January 8, 1985.

**5.** For this court to possess jurisdiction over NACIA's claim, the claim must rest on a breach of contract theory. This court would not have jurisdiction over a claim that does not allege breach of contract but rather contends only that the FCIC violated its own regulations in evaluat-

ing transfer requests. This court has jurisdiction over a claim based exclusively on an agency's violation of its regulations only when the regulations mandate payment of money by the United States for its violation. *See, e.g., United States v. Testan,* 424 U.S. 392, 400–01, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976). Notice 217 contains no provisions mandating payment of money by the FCIC for its violation.

two pertinent references to FCIC procedures in the substantive portion of the contract that define the obligations of the parties. Section III states, in pertinent part: "The Contractor (*i.e.,* NACIA] will ensure that service to policyholders is in accordance with applicable policy provisions and Corporation [*i.e.,* FCIC] procedures." Section XIII states, in pertinent part: "The Contractor and its Representatives have no authority to waive any provisions...." Thus, while the contract obliges the contractor to follow FCIC procedures, including Notice 217, there are no analogous contract provisions obliging the FCIC to reject transfer requests that do not comply with Notice 217.[6] This lack of symmetry in the contract is neither unusual nor unexpected. Through this scheme, the FCIC maintains ultimate control over its program. The scheme assures that the contractor cannot depart from established agency procedures without the agency's acquiescence.

Next, relying on *G.L. Christian & Associates v. United States,* 160 Ct.Cl. 1, 312 F.2d 418, *reh'g denied,* 160 Ct.Cl. 58, 320 F.2d 345, *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963), NACIA presents an alternative argument that even if the procedures were not incorporated by reference into the contract, they must, as a matter of law, be read into the contract. In *Christian,* the government's standard termination for convenience clause was omitted from a government construction contract even though the Armed Service Procurement Regulations stated that the standard clause "shall be inserted" in such a contract. The Court of Claims concluded:

> As the Armed Services Procurement Regulations were issued under statutory authority, those regulations ... had the force and effect of law. If they applied here, there was a legal requirement that

the plaintiff's contract contain the standard termination clause and the contract must be read as if it did.

*Id.* at 12, 312 F.2d at 424 (footnote and citations omitted). But *Christian* is inapposite because in the case at bar, there is no analogous requirement in any statute or regulation obliging the FCIC to include Notice 217 as a clause in the master marketing agreement.

Finally, NACIA alleges, in effect, that the guidelines in Notice 217 must be read into the contract because they involve substantive regulations implementing the specific transfer provisions contained in the contract. NACIA bases this argument primarily on an August 9, 1984, memorandum from the manager of the FCIC to the agency's Board of Directors, entitled "Control of Excessive Use of Transfer Provisions." The issue discussed in this memorandum is: "Should FCIC amend the 1986 Reinsurance Treaty and Agency Sales Contract to provide additional control of the transfer process and to discourage excessive or questionable transfers?" The memorandum expresses a series of concerns about the transfer process, including (1) the FCIC and private personnel spending an inordinate amount of time on the transfer process, (2) the process producing uncertainty from the policy holders' perspective as to who is responsible for servicing their contracts, (3) master marketers using questionable tactics in soliciting transfers, and (4) master marketers spending as much effort acquiring existing business from competitors as securing new customers.

The memorandum analyzes six possible methods of addressing these concerns, four of which involve a decrease in the amount of reimbursements to master marketers for transfer policies and one of which involves a restriction on the time period during

---

**6.** The preamble to the contract states:

> The [FCIC] hereby contracts with the Agency Sales and Service Contractor ... identified above for administering, selling, and servicing of Federal Crop insurance in accordance with the approved annual plan of operation, provisions of the Federal Crop Insurance Act, ... and procedures established by the [FCIC].

The preamble does not specifically indicate that the FCIC agrees to be bound by its procedures, and its language is consistent with only the contractor being bound. Moreover, the preamble appears to be no more than a summary of the rights and obligations later defined in the contract. As noted above, the later parts of the contract do not oblige the FCIC never to waive its procedures.

which transfer requests may be filed. The sixth and last method discussed, and the one upon which NACIA relies, is to "[i]mplement certain procedural provisions for the orderly transfer of business with the assuming company and its agent having the responsibility for completing the request for transfer." Among the specific possibilities discussed in this method were procedures obliging the following:

C. Forms are properly prepared and do not show any evidence of material entry tampering or date changing.

D. In the case of a transfer from a Master Marketing Company to another, proper signatures must appear on the forms, including the signature of the insured and the signatures of the assuming company official authorized to sign for the transfer.

In pertinent part, the August 9, 1984, memorandum did not recommend any immediate amendment to the master marketing agreement but instead recommended further study of the concerns discussed. NACIA contends, in effect, that Notice 217 was the product of that further study and that its provisions are contractually binding on the FCIC because they represent substantive regulations designed to further the agency's mission, *inter alia*, by discouraging master marketers from soliciting transfer requests from competitors' customers and thereby encouraging them to focus more effort on policy sales to farmers without federal crop insurance.

But the issue discussed in the August 9 memorandum is the possible amendment to the master marketing agreement. Clearly, had the FCIC amended the agreement to oblige it to reject requests that did not comply with Notice 217, the FCIC would have been guilty of a breach of contract if it then accepted such requests. However, the FCIC never amended the master marketing agreement in such a way.

Notice 217 cannot be interpreted as providing a substantive gloss on the transfer provisions contained in the master marketing contract that is enforceable by NACIA through a breach action under that contract. The pertinent terms in the master

marketing agreement are not ambiguous. In effect, a policy holder is entitled to have its policy transferred once each crop year to any master marketer that will accept the transfer. The transfer is effective upon notification of acceptance by the FCIC. Herein, NACIA has not disputed that the basic prerequisites set forth in the master marketing agreement for a transfer were present, *i.e.*, that the transfer requests were the first requests by the policy holders during the pertinent crop year; that the policy holders sought transfers to Long-View; that LongView wanted the business; and that the FCIC authorized the transfers. Rather, NACIA's sole objection is that LongView did not comply with the particular procedures the FCIC had issued covering the filing of transfer requests.

But Notice 217 does not indicate any intent to modify the FCIC's obligation under the master marketing agreement or, indeed, any intent to create any substantive rights enforceable by the firm from losing the policy. Notice 217 simply lists certain responsibilities of the firm *seeking* the transfer ("[a] master marketing company [seeking transfer] has the sole responsibility to assure that ..."). Rather than further defining the FCIC's contractual obligations to the firm losing the policy, the procedures, in pertinent part, simply indicate how the FCIC wants the firm seeking the transfer to package and present the pertinent transfer information to the FCIC, *e.g.*, the proper form to use and the time period within which the transfer requests should be filed.

No doubt, a master marketer's strict compliance with Notice 217 guidelines would facilitate the FCIC's efficient conduct of its business. However, when it issued Notice 217, the FCIC did not deprive itself of traditional agency discretion to waive such procedural guidelines in appropriate cases to serve the ends of justice. In this regard, the Notice 217 guidelines would appear to fall within the ambit of the Supreme Court's decision in *American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 539, 90 S.Ct. 1288, 1292, 25

L.Ed.2d 547 (1970), wherein the Court noted:

> [T]he general principle [is] that '[i]t is always within the discretion of a[n] ... administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. The action of [an agency] in such a case is not reviewable except upon a showing of substantial prejudice to the complaining party.'

(Citations omitted.) The Notice 217 provisions that NACIA alleges LongView violated when it submitted the transfer requests constitute such "procedural rules for the orderly transaction of business before [the FCIC]," and the FCIC never obliged itself contractually to reject all transfer requests that did not comply with those procedures.[7]

LongView's departures from the guidelines herein were arguably minor both when viewed individually and as an aggregate. As a result of the NACIA agents deciding to switch master marketers, LongView presented a large number of transfer requests to the FCIC. The NACIA policy holders apparently wanted their policies transferred to LongView and LongView wanted to accept them. The FCIC's authorization of the transfer requests involved a good faith effort to give effect to the policy holders' intent to switch agents. Moreover, NACIA was not substantially prejudiced by these transfers. NACIA's master marketing agreement anticipates that a policy holder can switch master marketers once each crop year.[8] Moreover, LongView serviced the policies during the period after the cancellation date and, hence, NACIA cannot allege that it was deprived of payments for work it performed on the policies after that date. In addition, NACIA ultimately was given an opportunity to be heard on all pertinent issues concerning the validity of the transfers, including the policy holders' intent to transfer to LongView. Finally, NACIA does not dispute that the FCIC frequently "waived" Notice 217 guidelines for other master marketers seeking transfers, including NACIA. For example, the FCIC accepted Form 481 from other master marketers and regularly applied a grace period to the 30–day filing requirement in Notice 217.

In sum, the FCIC was not contractually bound to reject all transfer requests that did not comply with the guidelines contained in Notice 217 and, hence, its acceptance of LongView's transfer requests did not constitute a breach of NACIA's contract. Defendant United States' motion for summary judgment is sufficient to carry the moving party's burden on summary judgment, and NACIA's response failed to demonstrate the existence of any dispute

7. For example, the master marketing agreement does not specify that any particular form be used to request a transfer, and both Forms 481 and 515 supply the necessary information for the FCIC to determine whether the prerequisites for a transfer set forth in the master marketing agreement were present. In issuing Notice 217, the FCIC apparently concluded that the use of Form 515 would be most efficient. But this does not mean the FCIC was precluded from exercising discretion in appropriate cases and accepting Form 481, much less that acceptance of such a form would constitute a breach of contract. Similarly, there is no contractual provision specifically setting time limits for the submission of a transfer request. The provision in Notice 217 that a transfer request be submitted within 30 days of the policy holder's signature permits the FCIC to give effect more quickly to the policy holder's decision to transfer master marketers and thereby minimizes any confusion by the policy holder as to the identity of the responsible master marketer. But these potential benefits do not mean that the FCIC violated NACIA's contract or otherwise acted improperly when it transferred the policies in an effort to serve the perceived ends of justice. Analogous reasoning applies to the other alleged deficiencies in the transfer requests.

8. Assuming that a breach of contract had occurred, it is not apparent that NACIA could demonstrate any significant damages. The transfer requests were submitted between September 1, 1985, and January 31, 1986. The first cancellation date for the spring crop insurance policies involved in NACIA's suit was April 15, 1986. Therefore, if the FCIC had promptly rejected the suspect transfer requests, LongView would apparently have had sufficient time to obtain new signatures from the policy holders and file new (and technically proper) transfer requests well prior to the April 15 cancellation date. As explained above, so long as LongView was the master marketer of record on April 15, 1986, it would be entitled to commissions for the spring 1986 crop seedings.

as to a material issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Therefore, defendant's motion for summary judgment in NACIA's action is granted, plaintiff NACIA's motion for summary judgment is denied, and third-party defendant LongView's motion for summary judgment is denied as moot.

### CONCLUSION

For the reasons set forth above, defendant's motions for summary judgment in both LongView's (No. 122–88C) and NACIA's (312–88C) actions are granted and the Clerk of the Court is directed to dismiss the complaints. No costs.

IT IS SO ORDERED.